UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| DONNA CURTIS | * | CIVIL ACTION NO. 15-400 |
| VERSUS | * | JUDGE DOHERTY |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE WHITEHURST |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.[1] Donna Curtis, born in January, 1962, filed applications for a period of disability, disability insurance benefits, and supplemental security income ("SSI") on March 2, 2010, alleging disability as October 6, 2008. By decision dated May 26, 2011, the Administrative Law Judge ("ALJ") denied her applications. (Tr. 79, 108, 120). On June 9, 2012, the Appeals Council denied her request for review. (Tr. 108, 120).

On July 30, 2012, claimant filed another application for a period of disability, disability insurance benefits and SSI alleging disability as of October 6, 2008, due to degenerative disc disease, nerve damage, mental illness, ankle problem, and neuropathy.[2] (Tr. 215-30). After her claims were initially denied, claimant requested a hearing, which

---

[1] Claimant improperly filed the appeal brief as a motion for summary judgment. In the future, plaintiff's counsel should follow the briefing procedures set forth in the Scheduling Order. [rec. doc. 8].

[2] Claimant acquired sufficient quarters of coverage to remain insured through December 31, 2014. (Tr. 31). Thus, claimant must establish disability on or before that date. *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990).

was held on December 11, 2013.  (Tr. 31).  At the hearing, claimant amended her alleged

onset date to April 8, 2011, due to a motorcycle accident on that date.  (Tr. 52).

By decision dated June 23, 2014, the ALJ denied her applications.  (Tr. 28-41)

After the Appeals Council denied claimant's request for review on December 23, 2014

(Tr. 1-7), claimant filed a Complaint for judicial review with this Court on February 18,

2015.

## I. STANDARD OF REVIEW

The Court limits its review of a denial of disability insurance benefits to two

issues: (1) whether the Secretary applied the proper legal standards, and (2) whether the

Secretary's decision is supported by substantial evidence on the record as a whole.

*Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Wingo v. Bowen*, 852 F.2d 827,

829 (5th Cir. 1988).

The findings of the Commissioner as to any fact, if supported by substantial

evidence, shall be conclusive.  *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420,

1422, 28 L.Ed.2d 842 (1971).  Substantial evidence is defined as more than a mere

scintilla.  *Id*., 402 U.S. at 401, 91 S.Ct. at 1427.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.  *Id*.

The Court may not, however, reweigh the evidence or substitute its judgment for

that of the administrative fact finder.  *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir.

1985).  If substantial evidence supports the administrative finding, the Court may then

only review whether the administrative law judge applied the proper legal standards and conducted the proceedings in conformity with the applicable statutes and regulations.  Id. at 393.

## II. BURDEN OF PROOF

Disability is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  The existence of such disability must be demonstrated by medically acceptable clinical and laboratory diagnostic findings, and the overall burden of proof rests upon the claimant.  *Cook*, 750 F.2d at 393.

The Commissioner uses a sequential, five-step approach to determine whether a claimant is so disabled.  *Ramirez v. Colvin*, 606 F. App'x 775, 778 (5th Cir. 2015).  The steps include: (1) whether the claimant is presently performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from performing any other substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The burden of proof is on the claimant at the first four steps.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  The burden of proof shifts to the Commissioner at the fifth

step to establish the existence of other available substantial gainful employment that a claimant can perform.  *Fraga v. Bowen*, 810 F.2d 1296, 1301-02 (5th Cir. 1987).  If the Commissioner identifies such employment, the burden shifts back to the claimant to prove that he could not perform the alternative work identified.  Id. at 1302.  Throughout the process, the ultimate burden of establishing disability remains with the claimant. *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983).

### III. ANALYSIS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability.

In fulfillment of Fed. R. Civ. P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is supported by substantial evidence, based on the following:

### A. Medical Evidence[3]

Claimant asserted disability due to physical and mental impairments.  As to her` physical problems, claimant was treated by Dr. Ernest Howard of Rehab Physicians of Georgia from 2008 to 2014.  An MRI dated August 15, 2008, showed mild facet arthropathy at L4-5 without significant stenosis; mild facet arthropathy and a small broad-based central and right disc bulge at L5-S1, which did not appear to displace or compress

---

[3]Although all of the medical records were reviewed by the undersigned, only those relating to the arguments raised in the briefs are summarized herein.

the right S1 root, and degenerative dessication primarily involving the L1-2 and L5-S1 disc, with a mildly dessicated appearance at L2-3 and L3-4.  (Tr. 323-24).  The impression was small broad-based disc bulge centrally along the right at L5-S1, diffuse bulge of the disc annuls at L1-2, facet arthropathy primarily from L3-4 distally without significant stenosis, and cholelithiasis (gallstones).  (Tr. 324).

On October 27, 2008, claimant complained of back pain radiating down the leg, but was overall doing a little better.  (Tr. 325).  On examination, she had full range of motion in the cervical and thoracic spines and upper and lower extremities, decreased extension in the lumbar spine, and palpable trigger points corresponding to her right sacroiliac ("SI") joint pain.  (Tr. 326).  Deep tendon reflexes, sensation, motor strength and muscle control were normal.

Dr. Howard's diagnoses were lumbar degenerative disc disease ("DDD") by history with chronic long-standing history of back pain, scleratome L5 distribution pain with regional right-sided SI pain, and history of anxiety/depression and lumbar DDD. (Tr. 327).  Dr. Howard continued her on Duragesic and Percocet for pain management and recommended epidural steroid injections if her pain became worse.  (Tr. 321-22).

On November 24, 2008, claimant reported that she was significantly better with her back, but was having more right hand pain and numbness.  (Tr. 331).  EMG/NCV studies showed carpal tunnel syndrome, right hand dominant and no findings of cervical radiculopathy.  (Tr. 330).  Dr. Howard gave her an injection and referred her to an

orthopedist for decompression surgery of her right dominant hand carpal tunnel symptoms.  (Tr. 339).

On February 10, 2009, claimant complained of spasms and low back pain.  (Tr. (Tr. 340).  She reported that her pain was alleviated by Percocet better than Lortab.  Dr. Howard gave her a trigger point injection and recommended that she see an orthopedist for carpal tunnel surgery.  (Tr. 342).

On March 4, 2009, claimant reported that she had fallen down the stairs and really hurt her back.  (Tr. 344).  Dr. Howard gave her a trigger point injection.  (Tr. 346).  He recommended L4-5/S-1 epidural steroid injections if her symptoms persisted.

On March 30, 2009, claimant reported that she was doing better after the shots, but still had a lot of back pain.  (Tr. 348).  On April 27, 2009, she had improved, with less constant sciatica symptoms.  (Tr. 352).  She requested another epidural steroid injection for increased pain on May 26, 2009.  (Tr. 355).  Dr. Howard gave her a trigger point injection and recommended physical therapy and a lumbar epidural steroid injection.  (Tr. 357).

On June 17, 2009, claimant reported that the epidural injection gave her almost a 100% pain reduction in the first week and 30% overall, but she was having some recurrent leg pain.  (Tr. 359).  Dr. Howard recommended that she reduce her Percocet use.  (Tr. 361).

On July 13, 2009, claimant reported that the shots worked great for the first 10 days, but the pain returned within the third week.  (Tr. 362).  She had palpable trigger points in multiple muscles.  (Tr. 363).  Dr. Howard gave her an injection.  (Tr. 364).

Claimant reported on August 10, 2009, that she was starting a job.  (Tr. 366).  Her pain and radiculopathy had improved overall.  Dr. Howard switched her medication from Percocet to Roxicodone on August 28, 2009.  (Tr. 371).

On September 25, 2009, claimant reported that the Roxicodone did not work as well as the Percocet.  (Tr. 372).  Her pain was stable.  Dr. Howard cautioned her about pain medications and her frequency of taking them.  He recommended reducing her narcotics to one quarter tablet per day per week.  (Tr. 374).

On November 23, 2009, claimant reported that her back was not hurting as much, but she had some exacerbation of carpal tunnel syndrome in her right arm and extensor tendinitis (tennis elbow).  (Tr. 378).  Dr. Howard's impression was lateral epicondylitis and carpal tunnel syndrome.  (Tr. 379).

On December 18, 2009, claimant's tennis elbow had resolved.  (Tr. 381).  She was doing better with decreasing her Tylenol and weaning off the Percocet.

On March 5, 2010, claimant reported back pain, bilateral numbness and tingling S1 distribution and increased left side pain.  (Tr. 391).  She was given a tendon sheath injection in the sacroiliac ligament bilaterally.  (Tr. 393).  She was not charged because she had no health insurance.

7

On March 31, 2010, claimant complained of pain down her right leg and tingling in her left foot after sneezing. (Tr. 396). Dr. Howard prescribed a Medrol dose pack. (Tr. 398).

Claimant presented at Gwinnett Medical Center on April 11, 2010, with increased low back pain extending down to her right lower extremity with some paresthesias after lifting her grandchild. (Tr. 782). She had a history of chronic back pain and degenerative disc disease. She was given a pain medication injection, and prescribed a Medrol dose pack. (Tr. 782). The diagnosis was acute exacerbation of chronic back pain. (Tr. 783).

On May 21, 2010, claimant reported to Dr. Howard that the pain medicine was clearly helping with her function and enabling her to perform her activities of daily living. (Tr. 404). Dr. Howard recommended possible epidural steroid injection, but plaintiff could not afford it at that time. (Tr. 406). He gave her a trigger point injection on June 22, 2010. (Tr. 410).

On August 3, 2010, claimant reported that she had "one of the best six weeks [she'd] had a long time for pain control." (Tr. 412). Her sciatica had improved. Dr. Howard prescribed Duragesic, Lortab, and Medrol dose pack as needed.

On October 20, 2010, claimant complained that her right leg dragged when she walked. (Tr. 418). Dr. Howard's diagnosis was enthesopathy, serratus posterior, quadratus lumbar, lumbar longissimus bilaterally. (Tr. 419).

Claimant reported on December 22, 2010, that she had "turn[ed] real bad."  (Tr. 424).  Dr. Howard gave her a trigger point injection.  (Tr. 426).

On January 17, 2011, claimant reported that her pain was much better after the shot.  (Tr. 428).  She was very happy with using the Roxicodone only three tablets daily during the previous month.  On examination, she had overall significant improvement.  (Tr. 429).

On March 11, 2011, claimant had stable pain control using Roxicodine and Soma.  (Tr. 434).  Dr. Howard stated that she had improved pain management and improved functionality.  (Tr. 436).

On April 8, 2011, claimant was admitted at Gwinett Medical Center after a motorcycle accident.  (Tr. 756).  Her diagnoses were closed head injury, subaracnoid hemorrhage, rib fractures, left scapular fracture, and chronic pain syndrome.  Her discharge prognosis was good.

On May 6, 2011, claimant saw Dr. Howard following her motorcycle accident.  (Tr. 440).  His impression was motorcycle accident exacerbation of lumbar degenerative disc disease.  (Tr. 441).

Claimant was also treated at Iberia Comprehensive Community Health Center for mid-back pain with muscle spasm and radiation down her legs and ankles from 2011-2013.  (Tr. 478, 480).  On July 11, 2011, she had no tenderness to palpation of the spine, normal range of motion of the lumbar spine, and negative straight leg raising bilaterally.

(Tr. 469, 478, 480).  She had normal range of motion in all joints of the extremities, and radiating left leg and lumbosacral pain.  (Tr. 470).  The assessment was chronic pain due to trauma, carpal tunnel syndrome, intervertebral disc degeneration, inflammatory myopathy (myositis), developmental aphasia and headache syndromes.  (Tr. 470, 479, 480).

Additionally, claimant was treated at University Medical Center ("UMC"), a charity facility, in 2011 and 2012 for a variety of complaints, including kidney stones, right low back pain radiating to the right leg, and left ankle pain.  (Tr. 513-79).

On September 15, 2011, claimant saw Dr. Howard for residual pain following her motorcycle accident superimposed on her chronic lumbar radiculopathy.  (Tr. 444).  She had successfully weaned off of Soma, and was taking Robaxin instead.  Dr. Howard prescribed Hydrocodone, Robaxin and Neurontin.  (Tr. 446).

Claimant reported improved lumbar pain on November 22, 2011.  (Tr. 447).  She had successfully weaned off Soma.  Dr. Howard prescribed Zanaflex.

On January 19, 2012, claimant reported good pain control.  (Tr. 450).  Dr. Howard prescribed Hydrocodone and Ultram as needed, and Neurontin at nighttime.  (Tr. 452).

Claimant requested a trigger point injection for back pain on March 12, 2012.  (Tr. 455).  Dr. Howard performed the injection.  (Tr. 457).

A CT of the brain at UMC taken on July 30, 2012, showed small asymmetric hyperdensity of the left external capsule, which might represent sequelae of a lacunar

10

infarct.[4]  (Tr. 557).

On October 30, 2012, claimant underwent a consultative internal medicine exam with Dr. Kenneth A. Ritter, Jr.  (Tr. 593).  She complained of intermittent low back pain radiating down her legs; ADHD; anxiety and depression problems; a reported stroke; intermittent right ankle pain, and kidney stones.

On examination, claimant had normal gait and station.  (Tr. 595).  Back range of motion was full and normal.  She had negative straight leg raises bilaterally.  She had no ankle swelling.  DP pulses were 2+ and equal bilaterally.  Neurologically, she was intact, with normal DTRs, strength and sensation.

Dr. Ritter's impressions were chronic, recurrent low back pain, with an essentially normal exam; a history of mental health problems with normal exam, except for some anxiety, and kidney stone with a scheduled lithotripsy.[5]

In the Medical Assessment of Ability to do Work-Related Activities, Dr. Ritter opined that claimant could lift/carry 10 to 25 pounds occasionally and 10 to 20 pounds frequently; had no impairment as to standing/walking or sitting; could frequently balance and occasionally climb, stoop, kneel, crouch and crawl, and had no physical function limitations or environmental restrictions.  (Tr. 596-97).

---

[4]Lacunar stroke or lacunar infarct (LACI) is a type of stroke that results from occlusion of one of the penetrating arteries that provides blood to the brain's deep structures. Patients who present with symptoms of a lacunar stroke, but who have not yet had diagnostic imaging performed, may be described as suffering from lacunar stroke syndrome (LACS).  https://en.wikipedia.org/wiki/Lacunar_stroke (last visited 3/28/16).

[5]Lithotripsy was performed at Interim LSU Public Hospital on October 31, 2012.  (Tr. 599-631).

On February 8, 2013, claimant complained of increased pain since a fall during the holidays, and kidney stones.  (Tr. 697).  On examination, she had overall 5/5 muscle strength; normal muscle bulk and tone; trigger points at the gastrocnemius muscles, longissimus muscles, lateral epicondyles, plantar fasciae, patellar bursae, rectus femoris muscles, SI ligaments and SCM (sternocleidomastoid) muscles.  (Tr. 698).  Dr. Howard's impression was low back pain, lumbar/thoracic radiculopathy, spondylosis – lumbar with myelopathy, spinal enthesopathy, sacroiliitis, and obesity.  He prescribed Hydrocodone-Acetominophen.

On April 5, 2013, claimant complained of low back pain after a motor vehicle collision on the same day.  (Tr. 694).  Her physical examination and diagnoses were unchanged.  (Tr. 695).  Dr. Howard refilled her prescriptions.

On April 11, 2013, claimant complained of increasing symptoms with pain.  (Tr. 690).  Dr. Howard prescribed Ambien and Soma, and gave her trigger point injections. (Tr. 691-92).  He added Hydrocodone-Acetominophen on May 29, 2013.  (Tr. 684).

On June 17, 2013, Dr. Howard completed a Physical Medical Source Statement, in which he stated that he diagnosed claimant with chronic lumbar DDD and radiculopathy. (Tr. 647).  Her symptoms included lower back pain, radiating leg pain and numbness. Her pain was moderate to severe and constant, requiring opiate prescriptions.

Claimant's clinical findings and objective signs included weakness, positive EMG findings and DDD on imaging.  She had narcotic sedation side effects from medication.

Dr. Howard checked that claimant's impairments had lasted or could be expected to last at least 12 months, and that emotional factors from depression and anxiety contributed to the severity of her symptoms.  (Tr. 647-48).

Dr. Howard indicated that claimant could walk one city block without rest or severe pain.  (Tr. 648).  She could sit and stand for 30 minutes at one time.  She could sit and stand/walk for a total of about two hours in an eight-hour working day.  She required a job that permitted shifting positions at will from sitting, standing or walking.

Claimant needed to include periods of walking every 30 minutes for five to 10 minutes each during an eight-hour work day.  She needed to take more than one to two unscheduled breaks during the work day due to muscle weakness, chronic fatigue, pain/paresthesias, numbness, and adverse effects of medication.  Her legs needed to be elevated to heart level for 10 to 20 percent of the work day due to pain.  (Tr. 649).  She needed to use a cane or other hand-held assistive device occasionally for security.

Dr. Howard opined that claimant could occasionally lift less than 10 pounds and rarely lift 10 pounds.  She could rarely twist, stoop, climb stairs and ladders, and never crouch/squat.  She had no limitations as to grasping, manipulating, or reaching.

Claimant was likely to be off task for 25% or more of a typical workday.  (Tr. 650).  She was incapable of even "low stress" work.  Dr. Howard opined that her impairments were likely to produce "good days" and "bad days."  He estimated that she was likely to be absent from work more than four days per month as a result of her

13

impairments.  He concluded that claimant's depression, for which she was on prescriptions, would affect her ability to work at a regular job on a sustained basis.

On July 9, 2013, claimant complained of increasing bilateral lower extremity pain ("BLE") and numbness.  (Tr. 676).  Dr. Howard's impression was low back pain, lumbar/thoracic radiculopathy, spondylosis – lumbar with myelopathy, spinal enthesopathy, sacroilitis, and obesity.  He injected her trigger points.  (Tr. 678).

On July 22, 2013, claimant's examination at Iberia Comprehensive Community Health Center revealed normal extremities, range of motion in all joints, and no erythema, warmth, swelling, or joint deformities.  (Tr. 656).  The impression was peripheral neuropathy, migraine headache, myositis, intervertebral disc degeneration, and moderate recurrent depression.

On September 16, 2013, claimant complained of increasing bilateral lower extremity pain and numbness with restless leg syndrome ("RLS") symptoms on history. (Tr. 669).  Dr. Howard prescribed Ambien, Hydrocodone-Acetomenophen, Klonopin, and Soma, and injected her trigger points.  (Tr. 671).

An MRI dated September 23, 2013, showed diffuse degenerative changes throughout the spine; L5-S1 diffuse disc bulge with right-sided focal disc protrusion just encroaching on the right S1 nerve root; L4-5 mild diffuse disc bulge with facet joint hypertrophy, and L3-4 diffuse disk bulge with facet joint hypertrophy most pronounced in the right neural foramen.  (Tr. 667).

14

On November 1, 2013, claimant complained of increasing back pain.  (Tr. 710).

Her exam and diagnoses were unchanged.  (Tr. 711).  Dr. Howard refilled her

prescriptions for Ambien, Oxycodone-Acetaminophen, and Soma, and gave her a trigger

point injection.  (Tr. 711-12, 838).

On February 28, 2014, claimant continued to complain of increasing bilateral

lower extremity pain and numbness with RLS symptoms.  (Tr. 842).  Her exam was

unchanged.  Dr. Howard added "OTH MIX/UNS NONDEP RX ABS UNS POU" and

"OPIOID TYPE DEPENDENCE CONT ABUSE" to her diagnoses.[6]  (Tr. 843).  He

discussed possible epidural steroid injection for neuropathic symptoms if adequate pain

control was not accomplished.  (Tr. 844).

On June 19, 2014, claimant continued with increasing BLE pain and numbness

with radicular and RLS symptoms.  (Tr. 848).  She requested a Klonopin increase.  Dr.

Howard recommended desensitization exercises and stretching exercise, a Mediterranean

diet, and alcohol avoidance with medications.  (Tr. 850).  She was given the form

"Narcotic Drug Dependence."  No changes were performed to medication dosages.

On February 11, 2013, Dr. Jaysant Desai performed a Physical Residual Functional

Capacity ("RFC") Assessment.  (Tr. 636).  He determined that claimant could lift/carry 20

pounds occasionally and 10 pounds frequently; stand/walk and sit about six hours in an

---

[6]Claimant is not alleging disability due to drug addiction.  A finding of disability must first be rendered
before determining whether alcoholism and/or drug addiction materially contributed to the disability.  ("If we find
that you are disabled . . . [then ] we must determine whether your drug addiction or alcoholism is a contributing
factor material to the determination of disability.").  *Brown v. Apfel*, 192 F.3d 492, 498 n. 4 (5th Cir. 1999) (*citing*
20 C.F.R. § 416.935(a)).

eight-hour workday; had unlimited push/pull ability; could occasionally climb ramps/stairs but never ladders/ropes/scaffolds; could occasionally balance, stoop, kneel, crouch and crawl, and had no manipulative, visual, communicative, or environmental limitations.  (Tr. 637-40).  He noted that her alleged ability to stand/walk limited to 30 minutes was not supported, because she was able to watch her grandchildren, go places with her grandchildren, go out on her own, and do some household chores.  (Tr. 641).

Regarding her alleged mental impairments, claimant was treated at Iberia Comprehensive Community Health Center for anxiety and moderate recurrent major depression.  On July 11, 2012, claimant stated that she was fine and tolerating medications without any side effects.  (Tr. 471).  She was prescribed Prozac and Wellbutrin.  (Tr. 476).

On November 19, 2012, Kelly Ray, Ph.D., performed a Psychiatric Review Technique on behalf of Disability Determination Services.  (Tr. 112).  Dr. Ray determined that claimant had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation.

In the Mental Residual Functional Capacity ("MRFC") assessment, Dr. Ray found that claimant was not significantly limited in her ability to remember locations and work-like procedures, understand, remember and carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance and be

punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and make simple work-related decisions, and moderately limited in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 115).

On October 29, 2012, claimant underwent a consultative psychological examination with C. Scott Eckholdt, Ph.D., MP.[7]  (Tr. 588).  She reported that she was not very good with managing money and got very confused.  Dr. Eckholdt noted that she had problems occasionally missing medication dosages and appointments.[8]  She admitted to using alcohol once a month.  (Tr. 589).

Claimant complained of anxiety, ADHD, depression, and memory problems.  She reported that her medication helped and made her symptoms manageable.  Her medications included Xanax, Wellbutrin and Prozac.  She complained that she forgot everything, and it had gotten progressively worse over the last five years.

On examination, claimant's concentration was poor.  Basic social skills appeared intact.  Basic receptive and expressive language skills were sufficient.

---

[7]This was claimant's second evaluation by Dr. Eckholdt.

[8]Records from claimant's psychiatrist, Dr. John Straetmans, who treated her in Georgia from 2004-09, indicate that claimant improved with medications, but occasionally did not take her medicine as prescribed.  (Tr. 713-55).

Claimant was told that she had a stroke; however, she had no reported sequalae from this. Additionally, she claimed that she had brain trauma and a brain hemorrhage after a motorcycle accident. Her depressive symptoms including fatigue, feeling that people were talking about her, and crying easily. Anxiety symptoms included bouncing her leg and pressure in her chest.

Claimant was alert and appeared aware of her surroundings. She exhibited adequate judgment. (Tr. 590). She appeared to have an adequate toleration of stress and frustration during the exam, consonant with managing stress levels in a working environment. She displayed adequate attention and concentration. Behavioral pace was adequate with fair effort and adequate persistence.

Claimant was cooperative and sociable. She appeared to have no memory problems. She appeared capable of counting money, but might need some assistance with managing finances at a more difficult level.

In conclusion, Dr. Eckholdt found no problems in cognition, comprehension, attention, and memory. Claimant did appear to have some thymoleptic suppression and anxiety due to medical problems. Attention and memory problems appeared to be secondary to her mood and anxiety than independent entities. She did appear to exaggerate symptoms related to her stroke.

Dr. Eckholdt stated that claimant's anxiety and depression appeared to be moderate in severity, but might need further treatment. She appeared capable of

18

sustaining concentration for at least a half hour block of time on menial tasks and cooperating with others in order to meet a larger goal.  He noted that motivation might be an impediment to returning to the labor force.

Dr. Eckholdt's impressions were major depression, recurrent, moderate, and generalized anxiety disorder.  Claimant's Global Assessment of Functioning ("GAF") score was 50.

## B. Hearing Testimony

At the hearing on December 11, 2013, claimant testified that she got her GED. (Tr. 54).  She took online courses at University of Phoenix and DeVry University, but was unable to complete them.  (Tr. 54-55).  She started at Masco at age 15, working her way up to office manager.  (Tr. 55).  She was laid off at Masco in 2008 because of downsizing.

Regarding complaints, claimant said that she started getting nervous and frustrated at work.  Prior to that, she had fallen down the stairs, and still had pain in her lower back, hips and legs, spasms in her calves, burning in her feet and carpal tunnel syndrome.  (Tr. 56-58).  She said that she had some relief from her medications.  (Tr. 57).

Additionally, claimant stated that she had increased pain after the motorcycle accident.  (Tr. 58).  She said that she had had about eight to 10 steroid injections from Dr. Howard, which helped for a couple of months.  (Tr. 59).

Claimant also reported that she had a car accident after the motorcycle incident.

She stated that it made her leg pain worse, and caused tremors in her arms.  (Tr. 59-60).

She said that she had worsening headaches, and could not complete a sentence.  (Tr. 60).

She said that her doctor told her that she had had a stroke, but she could not afford the

MRI or doctors' visits to confirm that.  (Tr. 61-62).

Claimant said that she was seeing a therapist every three to four months to get

medication for depression and anxiety.  (Tr. 63).  However, she did not do any

counseling.

As to restrictions, claimant testified that she could sit for about 30 minutes before

having to change positions.  (Tr. 64).  She said that she used to walk daily for about an

hour, but could now only walk to the end of the driveway to get the mail.  (Tr. 64,

69).  She stated that she could not squat, but could climb stairs with a railing.  She

reported that she had fallen down the stairs four times.  (Tr. 64-65).

Additionally, claimant reported problems with reaching overhead, bending down,

and getting up after kneeling.  (Tr. 65-66).  She said that she could lift a gallon of milk

with both hands.  (Tr. 65).  She testified that she dropped things all of the time.  (Tr. 66).

Regarding activities, claimant stated that she spent most of her day kind of moving

around.  (Tr. 59).  She reported that she took a bath or hot shower during the night to

relieve her right leg pain.  (Tr. 60).  She also watched TV, took care of her dog, did

dishes, and did some laundry depending on her pain.  Additionally, she had a driver's

license and drove to the corner store, but got very nervous on the roads.  (Tr. 69).

20

The Vocational Expert ("VE"), Mr. Buschears, classified claimant's past work as an administrative assistant as sedentary with a Specific Vocational Preparation ("SVP") of 7; office manager as sedentary with an SVP of 7; customer service representative as sedentary with an SVP of 5, and purchasing clerk as sedentary with an SVP of 4. (Tr. 71).

Claimant's attorney posed a hypothetical in which he asked the VE to assume a claimant of the same age, history, education, and background, with a sedentary RFC and limitations to sitting at one time for up to 30 minutes before needing to get up; sit, stand or walk for two hours total in an eight-hour day before needing to take breaks; needed to shift positions at will from sitting, standing or walking; needed to take unscheduled breaks during the working day; needed to have her legs elevated above the heart for 10 to 20 percent of an eight-hour day with prolonged sitting; could never crouch or squat, and could rarely twist, stoop, bend, climb stairs and ladders; would likely be off-task 20 percent or more of the time due to her symptoms in terms of concentration and attention, and would be absent more than four days per month. (Tr. 71-72). In response, the VE testified that she would not be able to perform any of her past work or any other work. (Tr. 72).

## C. Argument

Claimant argues that: (1) the ALJ erred in failing to give controlling weight to the treating physician's opinion and in failing to evaluate the treating physician's medical

source opinion in accordance with 20 C.F.R. § 404.1527(d), SSR 96-2p and *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000); (2) the ALJ's residual functional capacity ("RFC") determination is clearly erroneous because she claimed to assign great weight to Dr. Eckholdt's evaluation, but failed to acknowledge and incorporate his opinion that claimant appeared capable of maintaining attention and concentration on mental tasks for only one-half hour at a time, and claimed to give great weight to Dr. Ray's opinion, but ignored her opinion putting specific limitations on claimant's ability to maintain attention and concentration and to follow directions, and (3) the ALJ erred in failing to follow SSR 85-15's admonition to consult the vocational expert regarding the existence of occupations claimant could perform in light of her mental health limitations and her physical limitations.

Regarding the first argument, claimant asserts that the ALJ erred in failing to give controlling weight to the opinion of her treating physician, Dr. Howard.

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton*, 209 F.3d at 455; *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial

evidence."  *Newton*, 209 F.3d at 455 (*citing* 20 C.F.R. § 404.1527(c)).[9]

Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.  *Leggett v. Chater*, 67 F.3d 559, 566 (5th Cir. 1995); *Greenspan*, 38 F.3d at 237.

Here, the ALJ gave Dr. Howard's opinion little weight because it was inconsistent with the objective medical evidence, including his own treatment notes.  (Tr. 37).  She noted that Dr. Howard's records indicated that claimant's muscle strength was 5/5 overall and sensation was intact.  Despite this lack of objective findings, Dr. Howard opined that claimant could only stand or sit 30 minutes at a time for a total of two hours in an eight-hour day; only walk one block; would have to shift positions at will and include period of walking every 30 minutes; would have to elevate her legs at heart level when sitting, and would occasionally need to use a cane.  (Tr. 37-38, 647-48).

However, Dr. Howard's reports consistently show that claimant had 5/5 motor strength, normal motor control, full range of motion in the cervical and thoracic spine, normal reflexes, normal sensation (Tr. 326-467, 669-712, 836-50).  It is well established that subjective complaints must be corroborated by objective medical evidence. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (*citing Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)).

---

[9]At the time of the decision in *Newton*, the factors for the weighing of medical opinions were found at 20 C.F.R. § 404.1527(d).

Additionally, the ALJ gave Dr. Howard's opinion little weight because it concerned issues that are reserved for the Commissioner.  (Tr. 37).  It is well established that "the ALJ has sole responsibility for determining a claimant's disability status." (emphasis added).  *Newton*, 209 F.3d 455 (*citing Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)).  Whether pain is disabling is an issue for the ALJ, who has the primary responsibility for resolving conflicts in the evidence.  *Chambliss*, 269 F.3d at 522; *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir.1991).  Further, the ALJ is free to reject the opinion of any expert when the evidence supports a contrary conclusion.  *Id*.  Thus, it was within the province of the ALJ to give little weight to Dr. Howard's opinion.

Claimant further argues that the ALJ failed to consider the factors to assess the weight to be given to the opinion of a treating physician when finding that it is not entitled to controlling weight.  In *Myers v. Apfel*, 238 F.3d 617 (5th Cir. 2001), the Fifth Circuit held that an ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization.  *Id.* at 621 (*citing Newton*, 209 F.3d at 456); 20 C.F.R. § 404.1527(c).

The Court in *Newton*, however, concluded that, "*absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed

24

analysis of the treating physician's views under the criteria set forth in 20 C.F.R. §

[404.1527(c)]." (emphasis addded). *Id*. at 453. Furthermore, the Fifth Circuit has held

that ALJs are not required to consider the § 404.1527(c) factors before dismissing a

treating physician's opinion if there is competing first-hand medical evidence

contradicting that opinion. *Jones v. Colvin*, — F.App'x —, 2016 WL 158016, *4 (5th

Cir. Jan. 13, 2016); *Qualls v. Astrue*, 339 F.App'x 461, 467 (5th Cir. 2009) ("the *Newton*

court limited its holding to cases where the ALJ rejects the sole relevant medical opinion

before it").

In controverting Dr. Howard's opinion, the ALJ relied on the opinion of Dr. Ritter,

who was an *examining* physician. (emphasis added). Thus, unlike *Newton*, there is

competing first-hand medical evidence here. *See Newton*, 209 F.3d at 458 ("This is not a

case where there is competing first-hand medical evidence and the ALJ finds as a factual

matter that one doctor's opinion is more well-founded than another. Nor is this a case

where the ALJ weighed the treating physician's opinion on disability against the medical

opinion of other physicians who have treated or examined the claimant and have specific

medical bases for a contrary opinion.") (citations omitted). Thus, the ALJ was free to find

that  Dr. Ritter's opinion was more well-founded than Dr. Howard's, and was therefore

not required to specifically consider each of the § 404.1527 factors before reaching a final

decision. *Jones*, 2016 WL 158016, at *3; *Qualls*, 339 F.App'x at 467.

Claimant also argues that the ALJ erred in giving great weight to the "non-

examining non-treating bureaucrat known as a state agency medical consultant, Dr.

Jaysant Desai."  [rec. doc. 15, p. 8].  However, the Social Security Regulations provide

that state agency medical consultants are considered as experts in Social Security

evaluation and their findings *must* be treated as expert opinion evidence:

> State agency medical and psychological consultants and other program
> physicians, psychologists, and other medical specialists are highly qualified
> physicians, psychologists, and other medical specialists who are also
> experts in Social Security disability evaluation. Therefore, administrative
> law judges *must* consider findings and other opinions of State agency
> medical and psychological consultants and other program physicians,
> psychologists, and other medical specialists as opinion evidence, except for
> the ultimate determination about whether you are disabled (see §
> 404.1512(b)(8)).

(emphasis added).  20 C.F.R. § 404.1527(e)(2)(i); 20 C.F.R. 416.927(e)(2)(i); *see also*

SSR 96-6p (July 2, 1996) ("[f]indings of fact made by State agency medical and

psychological consultants and other program physicians and psychologists regarding the

nature and severity of an individual's impairment(s) must be treated as expert opinion

evidence of nonexamining sources at the administrative law judge and Appeals Council

levels of administrative review.").  Thus, this argument lacks merit.

Next, claimant argues that the ALJ's RFC determination is deficient because she

failed to incorporate the specific limitations identified by Drs. Eckholdt and Ray.

She noted Dr. Eckholdt's findings that she appeared capable of sustaining concentration

for *at least* a half hour block of time on menial tasks and cooperating with others to meet

a goal.  (emphasis added).  (Tr. 590).  This does not indicate a limitation, as Dr. Eckholdt

26

also said that claimant had *no* problem in the areas of cognition, comprehension, attention, and memory.  (emphasis added).  He also observed that she displayed adequate attention and concentration.  (Tr. 590).  Accordingly, the ALJ did not err in failing to incorporate these "limitations."

As to Dr. Ray, claimant noted that she assessed limitations in performing one and two step instructions, maintaining attention and concentration, completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 115, 127).  However, Dr. Ray also found that claimant was able to understand and remember short and simple instructions; sustain an ordinary routine without special supervision, work in coordination with others, and make simple work-related decisions. (Tr. 127).  She determined that claimant was not disabled.  (Tr. 129). *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995); *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir.1989) (substantial evidence supported ALJ's finding that claimant's subjective symptomology not credible when no physician on record stated that claimant was disabled).  Thus, the ALJ's finding is entitled to deference.

In the decision, the ALJ determined that claimant had the RFC to perform light work which did not require more than occasional climbing of ramps/stairs and never climbing ladders/ropes/scaffold, and did not require more than occasional stooping, kneeling, crouching or crawling.  (Tr. 36).  She also found that claimant was able to

understand, remember and carry out simple instructions; use judgment in making work-related decisions; respond appropriately to supervisors, co-workers and work situations, and deal with changes in a routine work setting.

Claimant asserts that the ALJ erred in concluding that because claimant could perform simple chores, she was capable of working.  The ALJ noted that ALJ was able to care of her personal needs, drive and shop independently, and do household chores.  (Tr. 35, 37).  At the hearing, claimant reported that she could do dishes and laundry, but was unable to sweep or vacuum.  (Tr. 37, 60).   In her Adult Function Report, claimant indicated that she prepared simple meals, did general housework, did laundry, drove, read, walked for 30 minutes, watched television, played games on the computer, took care of her dog, and spent time with her daughter and grandchildren.  (Tr. 278-82).  It is appropriate to consider the claimant's daily activities when deciding the claimant's disability status.  *Leggett*, 67 F.3d at 565.  Thus, the ALJ's credibility determination is entitled to great deference.  *Newton*, 209 F.3d at 459.

Additionally, the ALJ found that claimant's allegations were not supported by the objective evidence of record.  (Tr. 37).  She noted that claimant testified that she quit working because she was laid off, not because of her impairments.  This is confirmed by claimant's testimony.  (Tr. 55-56).

Further, the ALJ found that claimant's symptoms improved with treatment, which was confirmed by the medical records as well as claimant's testimony.  (Tr. 37, 57, 348,

352, 359, 366, 404, 412, 428, 434, 447, 450, 471).  If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability.  *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).  Thus, the ALJ's finding is entitled to great deference.  *Newton*, 209 F.3d at 459.

Next, claimant argues that the ALJ erred in failing to follow SSR 85-15's admonition to consult the vocational expert regarding the existence of occupations claimant could perform in light of her mental health and physical limitations. Specifically, she argues that the ALJ should have asked the VE hypothetical questions setting forth the limitations identified by Drs. Howard, Ray, and Eckholdt.

The undersigned notes that it was claimant's attorney, not the ALJ, who posed the hypothetical to the VE.  In that hypothetical, the attorney asked the VE to assume a claimant of the same age, history, education, and background, with a sedentary RFC and limitations to sitting at one time for up to 30 minutes before needing to get up; sitting, standing or walking for two hours total in an eight-hour day before needing to take breaks; shifting positions at will from sitting, standing or walking; taking unscheduled breaks during the working day; elevating her legs above the heart for 10 to 20 percent of an eight-hour day with prolonged sitting; never crouching or squatting, and rarely twisting, stooping, bending, climbing stairs and ladders; being off-task 20 percent or more of the time due to her symptoms in terms of concentration and attention, and being absent

more than four days per month.  (Tr. 71-72).  In response, the VE testified that she would

not be able to perform any of her past work or any other work.  (Tr. 72).

It is well established, however, that the  ALJ is not bound by VE testimony which

is based on evidentiary assumptions ultimately rejected by the ALJ.  *See Owens v.*

*Heckler*, 770 F.2d 1276, 1282 (5th Cir.1985); *Bayer v. Colvin*, 557 F.App'x 280, 287 (5th

Cir. 2014).  Here, claimant's attorney had the opportunity to incorporate all of the

limitations asserted by claimant.  As the hypothetical to the vocational expert reasonably

incorporated all disabilities of the claimant recognized by the ALJ, and the claimant or

her representative had the opportunity to correct any deficiencies, the ALJ's findings are

entitled to deference.  *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v.*

*Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

In any event, the ALJ did not rely on the vocational expert's testimony, instead

relied on SSRs 83-14 and 85-15 to find claimant not disabled.  (Tr. 39-40).  She noted

under these rules, occasional postural limitations as outlined in the RFC did not

significantly erode the unskilled light occupational base.   (Tr. 40).  *See* SSRs 83-14, 85-

15 (if a person can stoop, kneel, crouch or crawl occasionally in order to lift objects, the

sedentary and light occupational base is virtually intact).

Further, the ALJ noted that while an inability to sustain the mental activities of

competitive, remunerative work for an eight-hour day, five days a week, or similar

schedule on a regular basis significantly erodes the occupational base for work activity at

30

any exertional level, and warrants a finding of disability, that is not the case here.

      SSR 85-15 provides, in pertinent part, as follows:

> Where a person's only impairment is mental, is not of listing severity, but
> does prevent the person from meeting the mental demands of past relevant
> work and prevents the transferability of acquired work skills, the final
> consideration is whether the person can be expected to perform unskilled
> work. The basic mental demands of competitive, remunerative, unskilled
> work include the abilities (on a sustained basis) to understand, carry out,
> and remember simple instructions; to respond appropriately to supervision,
> coworkers, and usual work situations; and to deal with changes in a routine
> work setting. A substantial loss of ability to meet any of these basic
> work-related activities would severely limit the potential occupational base.
> This, in turn, would justify a finding of disability because even favorable
> age, education, or work experience will not offset such a severely limited
> occupational base.

SSR 85-15 (1985).

      Here, the ALJ found that claimant retained the ability to perform these basic

mental work activities.  This finding is supported by the opinions of Drs. Eckholdt and

Ray.  Dr. Eckholdt noted that claimant's medication helped and made her condition

manageable.  (Tr. 589).  As noted above, if an impairment reasonably can be remedied or

controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of

disability.  *Johnson*, 864 F.2d at 348; *Lovelace*, 813 F.2d at 59.

      Additionally, Dr. Ray determined that claimant had mild restriction of activities of

daily living; mild difficulties in maintaining social functioning; moderate difficulties in

maintaining concentration, persistence or pace, and no repeated episodes of

decompensation.  (Tr. 112).  In the MRFC assessment, she found that claimant was not

significantly limited in her ability to remember locations and work-like procedures,

understand, remember and carry out very short and simple instructions, perform activities

within a schedule, maintain regular attendance and be punctual within customary

tolerances, sustain an ordinary routine without special supervision, work in coordination

with or in proximity to others without being distracted by them, and make simple

work-related decisions, and moderately limited in her ability to understand, remember and

carry out detailed instructions, maintain attention and concentration for extended periods,

and complete a normal workday and workweek without interruptions from

psychologically based symptoms and perform at a consistent pace without an

unreasonable number and length of rest periods.  (Tr. 115).  As the ALJ's decision is

supported by the medical evidence, it is entitled to deference.

Based on the foregoing, it is my recommendation that the Commissioner's decision

be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties

aggrieved by this recommendation have fourteen (14) business days from service of this

Report and Recommendation to file specific, written objections with the Clerk of Court.

A party may respond to another party's objections within fourteen (14) days after being

served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any

objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

**FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed this 5th day of April, 2016, at Lafayette, Louisiana.

_____
**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**

33